# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-13-264

| | |
|---|---|
| NICHOLAS MORRISON<br><br>APPELLANT<br><br>V.<br><br><br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES and MINOR CHILDREN<br><br>APPELLEES | **Opinion Delivered** September 11, 2013<br><br>APPEAL FROM THE SCOTT COUNTY CIRCUIT COURT [NO. JV-2010-40]<br><br>HONORABLE TERRY SULLIVAN, JUDGE<br><br>AFFIRMED |

### ROBIN F. WYNNE, Judge

Nicholas Morrison[1] appeals from the termination of his parental rights to his son C.M. (born 8-9-01) and daughter M.M. (born 11-9-99). We affirm.

The Arkansas Department of Human Services (DHS) removed C.M. and M.M. from their mother's custody on December 22, 2010. At the time of removal, appellant lived with his wife, Kaycee, in Heavener, Oklahoma, and was disabled from a car accident.

The probable cause order was entered on January 13, 2011, at which time temporary custody of C.M. and M.M. was placed with Cecilia Costanzo. Appellant was permitted to continue every-other-weekend visits with his children as provided by the divorce decree. DHS was ordered, among other things, to initiate a home study on appellant pursuant to the

---

[1]The children's mother, Sahara Sliger, signed a voluntarily termination and is not a party to this appeal.

Interstate Compact on the Placement of Children (ICPC). A short time later, a case plan

summary was filed, in which appellant and Kaycee were ordered to

> 1) Cooperate with Arkansas and Oklahoma DHS;
> 2) Maintain stable and appropriate housing;
> 3) Obtain and maintain reliable means of transportation and consistent number for phone communications or messaging;
> 4) Comply with the Arkansas and Oklahoma DHS to complete the ICPC home study;
> 5) Speak no harmful words about the guardian or parent to the children;
> 6) Demonstrate a household budget; and
> 7) Contribute to the development and enforcement of the house rules for [M.M.] and [C.M.]

Following a hearing on March 8, 2011, the court adjudicated C.M. and M.M. dependent-

neglected based on neglect that placed them at substantial risk of serious harm:

> Specifically, the Court finds that (1) [C.M. and M.M.'s stepfather] Samuel Sliger exhibited inappropriate angry outbursts in the home; had been off of his medication for over a year; and used drugs (THC), for which Samuel Sliger admitted to testing positive; and (2) the parents neglected to take reasonable action to protect the juveniles from the dangerous and inappropriate circumstances that Mr. Sliger's actions created or appropriately supervise the juveniles in those circumstances.

The goal of the case was set as reunification with the mother, with joint custody for

appellant.

On July 12, 2011, the Oklahoma Department of Human Services visited and

conducted a home study on appellant and Kaycee's home. The resulting report, which was

dated August 3, 2011, recommended placing M.M. and C.M. with appellant.

A review hearing was held on July 26, 2011, and the court at that time continued the

goals of the case, kept custody of M.M. and C.M. with Cecilia Costanzo, and ordered

appellant and his wife to complete parenting classes. Another review hearing was held in

September, and the court made the following findings:

> The placement of permanent custody and the continuation of custody of the juveniles in the manner described above is in the best interests of, and necessary to the protection of, the juveniles' health and safety. . . . During this review period, the Crimes Against Children Division of the Arkansas State Police ("CACD") has also made a true finding of sexual abuse (as to [M.M. and C.M.]) against Samuel Sliger. Nick Morrison acted inappropriately during visitations with juveniles during the last review period, and has (along with his wife Kaycee) moved into a new residence during this review period and will [be] living independently for the first time during the pendency of this case.

A permanency-planning hearing was held in December 2011, and the court ordered that M.M. and C.M. would be placed with appellant in Heavener, Oklahoma, beginning at the end of the fall school semester.

On March 27, 2012, the court held a fifteen-month permanency-planning hearing. The order arising out of that hearing stated that on January 27, 2012, DHS had ended the ICPC placement "based on the condition and treatment of the juveniles as well as the living conditions" in appellant's home. Custody of M.M. and C.M. was ordered to remain with DHS.

A permanency-planning hearing was held on July 24, 2012, at which time the court changed the goal of the case to termination of parental rights and adoption. DHS filed a petition for termination of parental rights on October 3, 2012. At the termination hearing, appellant testified that he currently lived in a 1400 square-foot, three-bedroom home with his wife, their daughter (K.M., born February 22, 2012), his daughter B.M., and his wife's son G.Mc. He testified that he was unable to work but received disability, as did B.M. and K.M.; they were able to pay their bills with money left over. He testified that his wife had previously worked as a CNA, but now she stayed home with K.M., who had special needs at birth but who was improving. He believed that the children were taken out of his home

during the trial placement because M.M. had a cut on her foot and they did not believe it was serious enough for a doctor's appointment; he did not think there was anything wrong with the house except for some toys being on the floor. Appellant believed that he had done everything he was supposed to do to get custody of his children.

Brandi Jones, a CASA supervisor, testified that she went to appellant's home on January 25, 2012, and found several problems. First, M.M. had a deep cut on her foot that the school nurse believed should have had stitches. M.M. stated that her father had told her that it would be fine, and they did not have any medicine to clean the cut or any bandages. The house had adequate food, but was extremely messy—there was no place to sit, C.M.'s bedroom door would not open, M.M. and B.M. were sleeping on couch beds on the floor because their beds had clothes on them, and the house smelled like wet dogs and urine. M.M. came home from school very upset about the idea of her father having her mother put in jail for child support; in the conversation between appellant and M.M., appellant brought up inappropriate information about M.M.'s mother. M.M. picked up a knife and was waving it around before appellant and Jones were able to get it away from her.

Dana Alexander, DCFS Supervisor for Scott County, testified regarding appellant's visits with the children. DHS had concerns with returning the children to appellant because of the disruption it would create in their lives (they were both in therapy) and the issues with the number of children in the home and the household income. Alexander and adoption specialist Kimberly Yates testified that both children were adoptable.

Stephanie Holland, the Court Appointed Special Advocate, testified to the progress appellant and his wife made on their home (cleaning, installing laminate flooring). She also

testified regarding the children's grades and the way they were thriving in Ms. Costanzo's care. Holland testified that the children had a strong bond with their father and recommended continued contact if termination were granted.[2]

In its order terminating appellant and his ex-wife's parental rights to C.M. and M.M., the circuit court found that DHS had proven by clear and convincing evidence that:

> A. Other factors arose subsequent to the Department's original petition that demonstrate that return of the juveniles to the custody of the Nicholas Morrison is contrary to the juveniles' health, safety, or welfare and that, despite the offer of appropriate family services, Nicholas Morrison has manifested the incapacity and an indifference to remedying the subsequent issues or factors or to rehabilitate Nicholas Morrison's circumstances that prevent return of the juveniles to Nicholas Morrison's custody. The Court finds that the Department has offered and provided reasonable and meaningful family services throughout the pendency of this case to assist Nicholas Morrison in having the juveniles placed into his custody given Nicholas Morrison's issues related to providing a stable and appropriate home and appropriate parenting and supervisory skills, namely, referrals for counseling and therapy, foster home placements, medical services for the juveniles, transportation assistance, random drug screens, visitation with the juveniles, performance of strength and needs assessments, casework services, case planning and case management, placement services related to the juveniles' short-lived placement, and three home studies. The Court further finds that Nicholas Morrison has manifested an incapacity and indifference to remedying Nicholas Morrison's issues and Nicholas Morrison's failure to comply with the case plan, failure to comply with the orders of this court, and failure to provide an appropriate placement for the juveniles during the juveniles' ICPC placement with him because Nicholas Morrison is still without sufficient employment or income to

---

[2]At the termination hearing, there was some discussion regarding continued visitation between appellant and the children after termination of appellant's parental rights and adoption. We note that the circuit court is without authority to order continued visitation with a parent after termination. *See Rhine v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 649, at 7, 386 S.W.3d 577, 581 ("'A termination of parental rights is both total and irrevocable. . . . [I]t leaves the parent with no right to visit or communicate with the child, to participate in, or even to know about, any important decision affecting the child's religious, educational, emotional, or physical development.'" *Lassiter v. Dep't of Social Servs.*, 452 U.S. 18, 39, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)).

provide for the juveniles if they were to be returned home, Nicholas Morrison admitted that he would not be able to care for the juveniles if Nicholas Morrison's wife worked to obtain additional income, and Nicholas Morrison has continued to demonstrate the same problems with parenting and supervision that have existed throughout this case during, including such instances as when this Court found that Nicholas Morrison acted inappropriately during visitation with the juveniles by allowing the juveniles to use and be around fireworks that resulted in at least one of the juveniles being injured and when this Court found that Nicholas Morrison was unable to provide an appropriate placement for the juveniles during the ICPC placement. In reaching these legal and factual findings, the Court relied on the testimony described below in Paragraph 6 and the information that has been presented to this Court throughout this case.

B. Nicholas Morrison subjected the juveniles to aggravated circumstances and this Court specifically finds that there is little likelihood that services to the family will result in successful re-unification. Specifically, this Court finds that despite reasonable and meaningful efforts by the Department described above, Nicholas Morrison has been unable to provide a safe and appropriate environment for the juveniles; Nicholas Morrison continues to display the same sort of parenting, supervision, income, and environmental issues that have existed throughout this case; Oklahoma has repeatedly refused to approve a home study for the placement of the juveniles in the home, and Nicholas Morrison has admitted that there are even more people in the home with Nicholas Morrison and that no additional income is expected into the home because Nicholas Morrison's wife is unable to work due to Nicholas Morrison's admitted inability to take care of the juveniles without his wife being there. Thus, there is little likelihood that continued services to the family will result in successful re-unification. In reaching these legal and factual findings, the Court relied on the testimony described below in Paragraph 6 and the information that has been presented to this Court throughout this case.

The court went on to address adoptability and potential harm. The court focused on the issue of permanency and stated that it had considered that the case had been going on for approximately two years; that appellant had not been able to provide a placement that was safe and appropriate; that there was no way to know whether appellant would get an approved home study or sufficiently address parenting, supervision, income, and environmental issues that had existed throughout the case.

In cases involving the termination of parental rights, there is a heavy burden placed on the party seeking to terminate the relationship. *Blackerby v. Ark. Dep't of Human Services*, 2009 Ark. App. 858, at 4, 373 S.W.3d 375, 378 (citing *Camarillo-Cox v. Ark. Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005)). This is because termination of parental rights is an extreme remedy in derogation of the natural rights of the parents. *Id.* Nevertheless, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.* Thus, parental rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children. *Id.*

Arkansas Code Annotated section 9-27-341(b)(3) requires that an order terminating parental rights be based upon clear and convincing evidence. Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Id.* It is well settled that when the burden of proving a disputed fact is by clear and convincing evidence, the question that must be answered on appeal is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence was clearly erroneous. *Id.* In making this determination, we review the case de novo but we give a high degree of deference to the trial court, as it is in a far superior position to observe the parties before it and to judge the credibility of the witnesses. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

On appeal, appellant challenges only the trial court's best–interest finding. Specifically, he contends that termination of parental rights was not proven to be in the juveniles' best interests due to insufficient evidence. He challenges the court's reliance on Oklahoma DHS's refusal to approve the ICPC home study; he argues that the condition of his home at the time the children were removed from the trial placement was an isolated incident; and he contends that DHS failed to provide him with appropriate services. Ultimately, he contends it was in the children's best interest to continue reunification services[3] and not to take the extreme measure of terminating his parental rights.

A court's finding that termination of parental rights is in a juvenile's best interest must include consideration of the likelihood of adoption and the potential harm caused by returning the child to the parent's custody. *See* Ark. Code Ann. § 9-27-341(b)(3)(A). This potential-harm inquiry is but one of the many factors that a court may consider, and the focus is on the potential harm to the health and safety of a child that might result from continued contact with the parent. *Cariker v. Ark. Dep't of Human Services*, 2011 Ark. App. 574, at 10, 385 S.W.3d 859, 865. The court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Id*. Furthermore, the potential-harm analysis should be conducted in broad terms. *Id*.

On this record, we are not left with a definite and firm conviction that a mistake was made. While appellant points out that he complied with a substantial portion of his case plan, even full completion of a case plan is not determinative of the outcome of a petition to

---

[3]Part of appellant's argument is premised on the children being placed with their maternal grandmother. We note that the court never found that Ms. Costanzo is the children's grandmother, and it appears that she is a family friend.

terminate parental rights. *Cole v. Ark. Dep't of Human Services*, 2012 Ark. App. 203, at 7–8, 394 S.W.3d 318, 322. What matters is whether completion of the case plan achieved the intended result of making the parent capable of caring for the child—mere compliance with the directives of the court and DHS is not sufficient if the root cause of the problem is not dealt with. *Id.* Here, appellant never demonstrated to the court that he was capable of providing the children with a safe, appropriate home.

Affirmed.

PITTMAN and GRUBER, JJ., agree.

*Janet Lawrence*, for appellant.

*Tabitha McNulty*, County Legal Operations, and *Chrestman Group, PLLC*, by: *Keith L. Chrestman*, for appellees.