
# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV-16-1083

| | |
|---|---|
| LEANNA SALAZAR<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES AND MINOR<br>CHILD<br><br>APPELLEES | **Opinion Delivered:** April 5, 2017<br><br>APPEAL FROM THE HOT SPRING<br>COUNTY CIRCUIT COURT<br>[NO. 30JV-14-142]<br><br>HONORABLE CHRIS E WILLIAMS,<br>JUDGE<br><br>AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant appeals from the circuit court's termination of her parental rights to A.M., born 8/15/14. On appeal, appellant argues that (1) the circuit court erred in abdicating its duty to evaluate the evidence and make its own findings as to the issue of A.M.'s placement across state lines with appellant, and (2) there was insufficient evidence to support a finding that termination was either in A.M.'s best interest or that the alleged grounds were proven or relevant to the circumstances of appellant and her boyfriend, Jeffrey McCollum.[1]

On November 3, 2014, though they lived in Killeen, Texas, appellant and McCollum were driving through Arkansas on their way to Missouri when they were subjected to a routine traffic stop. Finding K2 (synthetic marijuana) and an infant in the car

---

[1]McCollum is not A.M.'s biological father. McCollum is identified as appellant's fiancé in the affidavit in support of DHS's petition for emergency custody and dependency-neglect and the home study, despite being referred to as her boyfriend before this court. He participated in appellant's case plan from inception.

"covered by a blanket" that had "K2 smoke trapped" underneath it, appellant was arrested for possession of a controlled substance and endangering the welfare of a minor in the second degree. McCollum was arrested for possession of a controlled substance, possession of drug paraphernalia, and endangering the welfare of a minor in the first degree. The Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect on November 6, 2014. The circuit court entered an ex parte order granting the petition on the same date.

A probable-cause order was entered on December 11, 2014, stating that appellant had waived the necessity for a probable-cause hearing and finding that probable cause existed—and continued to exist—for A.M.'s removal. An adjudication order was entered on January 23, 2015, adjudicating A.M. dependent-neglected due to neglect and parental unfitness. Appellant stipulated that DHS would prove the facts stated in the affidavit and the circuit court found the same. In the order, the circuit court stated that it would transfer the case to State of Texas "if the Court in the resident county of the mother will accept transfer." The goal of the case was reunification.

In the circuit court's April 16, 2015 review order, it stated that appellant had not yet received the case plan and therefore extended her time to complete her case plan by one month. It specifically stated that it "would not transfer [the] case to Texas at this time."[2] The goal of the case continued to be reunification.

---

[2]No explanation was given.

The circuit court's July 16, 2015 review order restated that the goal of the case was reunification and that the case would not be transferred to Texas. It stated that appellant "needs to comply with the case plan" for she had "minimally complied" in that she attended visits with A.M., but had "not provided proof that she had stable housing, attended counseling, completed a drug and alcohol assessment, completed a psychological evaluation or obtained employment." It noted that appellant had informed DHS that she would obtain services in Texas instead of Arkansas "through the Department" there. Appellant was advised that said services would need to meet Arkansas's DHS requirements and that she would be financially responsible for services she obtained outside of Arkansas.

The circuit court entered an order on September 30, 2015, seeking an expedited placement decision under the Interstate Compact on the Placement of Children (ICPC) finding that under "Article III(d) of the [ICPC] codified as Arkansas Code Annotated section 9-29-201 et seq., this court may only authorize the Arkansas Department of Human Services ("DHS") to place each of the above juvenile [sic] in a receiving state, including provisional placement . . . after receipt of written notification from the receiving state that the proposed placement does not appear to be contrary to the best interest of the juvenile."[3]

In its November 4, 2015 review order, the circuit court found that appellant had "complied with the case plan in that she has attended visits with the juvenile, attended counseling, completed a drug and alcohol assessment, attended drug treatment, completed parenting classes, [and] completed a psychological evaluation." However, appellant still

---

[3]A second and third order for an expedited ICPC placement decision were entered on October 14, 2015, and November 6, 2015.

needed to complete an ICPC home study, have her employment verified by DHS, and have McCollum's Social Security benefits verified by DHS. Its order also noted that McCollum had attended visits with A.M., attended counseling, completed a drug and alcohol assessment, attended drug treatment, and completed parenting classes. Finally, a Court-Appointed Special Advocate (CASA) was appointed and the circuit court stated that it would order an ICPC home study of appellant's residence in a separate order.

A permanency-planning order was entered on January 15, 2016, stating that "[t]he Court, mindful of the available permanency-planning dispositions, does hereby determine that it is in the best interest of the juvenile that the goal of the case shall be: To authorize a plan to return the juvenile to the parent, [appellant]." It went on to state:

> The Court finds [appellant] is complying with the established case plan and orders of the Court, making significant measurable progress toward achieving the goals established in the case plan, and diligently working toward reunification. Specifically, the conditions that caused the juvenile's removal and the juvenile's continued removal from the home; and the return of the juvenile to [appellant] shall occur within a time frame that is consistent with the juvenile's developmental needs but no later than three (3) months from the date of the permanency planning hearing[.]

The circuit court stated that appellant still needed to complete an ICPC home study. The order stated that the circuit court would await the results of the ICPC home study "to determine the issue of custody of the juvenile with [appellant] and for monitoring purposes if the child is placed with [appellant]." If approved, A.M. was to be placed with appellant, noting that the circuit court "[wanted] to move as quickly as possible closing the case."

On February 12, 2016, DHS noted that Texas had denied placement of A.M. with appellant and closed its file. The attached December 27, 2015 home study stated that it had been determined that the conditions in appellant's home were "Favorable" and that

placement was "recommended" in appellant's family home based on the strengths determined during the assessment. However, it also stated that the "decision to verify or approve a home lies with the Foster and Adoptive Home Development Program" and that there was "no guarantee" that the home would be verified or approved based on the recommendation. A December 29, 2015 Kinship and Disposition Summary detailed that appellant's home had not been selected as a placement option due to a safety concern and a well-being concern. It stated that before reconsideration could be made, McCollum had to begin treatment for his schizophrenia, appellant and McCollum needed to complete drug and alcohol screenings or obtain recommendations from their therapist that they were drug free with the tools to remain so, and background checks needed to be completed in any state they had resided in the last five years, including Arkansas and Missouri.

In the circuit court's fifteen-month-review order entered March 14, 2016, it changed the goal of the case to termination of appellant's parental rights and adoption. It stated that while appellant had complied with the case plan and McCollum had sought services as well as attended visits with A.M., the ICPC home study on their home was denied. It ordered that concerns raised in the home study "shall be addressed prior to placement of the juvenile with" appellant in Texas. DHS was ordered to request a follow up with the ICPC home study and prepare an addendum to the ICPC home study to be sent to Texas. The circuit court specifically noted that while the goal of the case had been changed to adoption, prior to the termination of parental rights (TPR) hearing, it "shall consider placement of the juvenile with the [appellant] in the State of Texas through ICPC if the issues raised by the State of Texas can be resolved."

SLIP OPINION

Appellant filed a motion to show cause on May 12, 2016, stating that "at the February 23, 2016 hearing, it was discovered that the original home study," which was denied on December 29, 2015 by Texas, "did not contain the updated material that showed the compliance of the Defendant, with the bulk of the issues review [sic] by DCFC in Texas" and DHS "represented to the court that it would send an addendum." Appellant had determined that DHS had not requested the addendum as of May 11, 2016, thereby prejudicing her, and sought a contempt citation. An order to show cause was entered on May 20, 2016.

On June 12, 2016, appellant's and McCollum's counselor since April 22, 2016, forwarded a letter stating that appellant had "made progress in regarding [sic] issues previously thought to be concerns in such a manner that [she did] not believe they [were] concerns at the time." She stated that appellant had "appropriately addressed concerns" about her father's contact with A.M. However, while noting McCollum's "potential to be more independent with support around learning tools to manage his symptoms appropriately[,]" she stated that his "need for intensive support and his not being open to receiving support from anyone but [appellant made] her hesitant to recommend the child be placed in the couple's home at this time." She suggested that three to four months of additional time be given for appellant and McCollum to "learn how to act in a manner where [A.M.] is a priority consistently."

Also on June 12, 2016, the counselor forwarded a letter stating that McCollum had made an appointment with a psychiatrist for the middle of July, but was seeking to be seen earlier through cancellations. She noted that McCollum had shown "a tendency to avoid

taking appropriate responsibility necessary for a person with the mental and physical conditions";[4] however, she thought he had "the potential to parent appropriately if he takes proper self-care and follows professional recommendations from everyone on his treatment team." While she thought he had the potential to be an "effective parent[,]" he needed more time to "actualize that potential." McCollum simply needed more time "[d]espite his recent increased compliance[.]"

In its July 11, 2016 order, the circuit court granted appellant's motion to dismiss her motion to show cause, and the TPR hearing was continued for a period of a little under a month with "[g]ood cause being that the ICPC home study has not been completed on the mother's home and it is anticipated that it will not be completed prior to June 28, 2016." Despite the continuation of the TPR hearing, DHS filed a petition to terminate appellant's parental rights on July 14, 2016, citing the grounds of failure to remedy cause for removal,[5] that other factors arose subsequent to the petition and appellant had manifested and incapacity or inability to remedy the subsequent issue,[6] and that A.M. had been subjected to aggravated circumstances where a determination had been made that there was little likelihood that services to the family would result in successful reunification.[7]

---

[4]McCollum has multiple sclerosis in addition to schizophrenia.

[5]*See* Ark. Code Ann. § 9–27–341(b)(3)(B)(i)(a) (Repl. 2015).

[6]*See* Ark. Code Ann. § 9–27–341(b)(3)(B)(vii)(a).

[7]*See* Ark. Code Ann. § 9–27–341(b)(3)(B)(ix)(a)(3)(B)(i).

In the petition, DHS stated that it had completed background checks on appellant and McCollum as requested by Texas and had provided all pertinent information in its possession to address Texas's concerns, however, Texas responded upon receipt that "the information provided did not elevate the concerns addressed in the original home study and the home would not be reevaluated." Because appellant's current home had not passed the ICPC home study, A.M. could not be returned to appellant's custody.[8] It listed A.M.'s potential harm as appellant's "inability to provide a safe and appropriate housing[.]"

Appellant responded to DHS's petition on August 1, 2016, in pertinent part, stating that DHS had failed to exercise reasonable efforts in obtaining the home study as required by the ICPC. She also stated that of the three concerns upon which denial was made—failure to treat McCollum's schizophrenia properly, no proof of treatment for drug use and completion of required drug and alcohol screenings, and failure to complete background checks—two, namely the background check and proof of drug treatment and screening, were DHS's responsibility. She noted that both she and McCollum had completed drug and alcohol screenings and treatment and that DHS did not seek criminal background checks until months after the ICPC home study had been completed.[9]

---

[8]The CASA report did not make a recommendation, stating only that DHS reported that "the second ICPC home study out of Texas on the parents has been denied." Furthermore, under the "DEVELOPMENTS and PARENT PROGRESS" section, no mention is made of appellant's or McCollum's progress.

[9]She stated that McCollum currently had an appointment with his psychiatrist and could live outside the home while bringing himself into compliance.

Attached also to the response was a detailed list of when she and McCollum received and completed services as well as two August 18, 2016 letters from their counselor. In her letter regarding McCollum, she stated that he had had an "observable shift in his ability to take more responsibility for appropriate self-care" and had "made progress quicker than [she] had expected." She felt at that time that he had the support and the "ability to interact with this support appropriately enough to be a healthy parent." In her letter regarding appellant, she stated that appellant's "ability to set boundaries with all individuals she loves in regards to what she views as acceptable and unacceptable leads [her] to feel confident in stating that she has the ability to stay mentally healthy enough to parent with excellence."

A hearing on appellant's TPR petition was held on August 20, 2016. A DHS supervisor on the case testified that DHS had no knowledge of appellant being released from counseling; though she had contacted appellant's new employer and obtained her potential start date, DHS had no "verification of employment" and did not know if appellant still had the job; and McCollum had not submitted an update on his Social Security benefit amount, which DHS showed as being $488.67 per month. The supervisor testified that one reason for denial of appellant's Texas ICPC home study was McCollum's untreated schizophrenia, a concern which DHS concurred with and a diagnosis of which DHS had not been informed. McCollum had begun treating with a psychiatrist in June 2016, but DHS had not received anything from the psychiatrist.

He supervisor spoke of DHS's concern that appellant's father—who sexually abused appellant's sister—would be around A.M. given appellant's continued partial financial support from her parents and appellant's still being around her father. She stated that an

ICPC home study was first done on appellant's parent's home and was denied based on appellant's father's conviction for sexually abusing his daughter. The ICPC home study is how DHS learned of the conviction; appellant "was not forthcoming about the previous conviction" and "[a]t one point had even denied that it existed." It was after the denied home study of her parent's home that appellant requested a home study on her home.

The supervisor testified that DHS submitted the requested addendum information to Texas twice, but the home study was still denied, so there was not an approved ICPC home study from Texas on appellant's home. She admitted that DHS had not initially submitted material to Texas showing that appellant and McCollum had completed drug testing or submitted to any drug screening, but explained that "[w]hen you request an ICPC home study you give the information requesting [sic] the home environment" and requested information; "[y]ou don't give case plan completions." Furthermore, she stated that appellant's financial situation had been an issue from "day one" and that appellant's "reliance on her parents for financial income" was connected to that issue. She testified to informing appellant that her reliance on her parents financially "would not be appropriate" after learning of her father's sexual abuse conviction. Finally, she noted that A.M. was "highly adoptable" having "very little medical issues."[10] She also noted that appellant was pregnant at the time of the hearing.

Appellant testified, in pertinent part, to thirty-six visits with A.M. at a cost of "about $250.00" to her for each visit and a total spent of "about $19,445" as evidence of how much

_____

[10]An adoption specialist testified agreeing that A.M. was adoptable.

she and McCollum paid to comply with the case despite their low monthly income. She borrowed the $19,000 from her sister, mother, and father, despite the inappropriateness of her reliance on her father given his criminal history. Despite initially receiving money from him, appellant asserted that she had not borrowed money from him "in a while" and had been borrowing money from her mother, who was divorcing her father, though they still lived together. Appellant asserted that she had "no relationship with [her] father in the last six to eight months because [she wants her] daughter home" and stated that she had "cut [her] father out of [her] life completely" for the same reason.

Appellant testified that McCollum had been on a waitlist with the psychiatrist since November 2015 and was on three different cancellation lists in hopes of getting in sooner; he was seen by a psychiatrist on August 3, 2016. Despite knowing about McCollum's schizophrenia from "day one" of them getting together, she did not tell DHS that McCollum had schizophrenia because "nobody ever brought up schizophrenia being an issue." All appellant's drug tests had been negative, including a hair follicle test the week before the hearing.[11] She was unemployed at the time of the hearing, and McCollum's Social Security check was $733.00 per month.

McCollum testified, in pertinent part, that he was taking Effexor, Seroquel, and Keppra as was prescribed by his psychiatrist.[12] He was still seeing his counselor and would

---

[11]She did have one positive test, but it was positive for prescribed medication.

[12]Of the three, he only identified what Keppra was prescribed for, which he identified as being used for seizures.

continue. He had only tested positive for drugs once, at the beginning of the case, and had never been involuntarily institutionalized.

Appellant's mother testified that she and her husband, appellant's father, had financed appellant's trips to Arkansas. She stated that appellant "understands that her father's not to be around [A.M.]" and doubted "highly" that appellant would allow A.M. around appellant's father. Appellant could not have complied with the requirements placed on her by Arkansas without the money she supplied to appellant. She denied that appellant's father demanded anything like companionship or her presence from appellant in exchange for the money he gave her.

At the conclusion of testimony, appellant sought a finding of lack of reasonable efforts on DHS's part for failing to get the home study in the first year of the case; the request was denied.

On September 7, 2016, the circuit court entered an order terminating appellant's parental rights to A.M. The court found that DHS had proven all three grounds. It stated that the grounds were supported by (1) Texas's denial of appellant's ICPC home study; (2) appellant's lack of employment and inability to financially support A.M. without support of McCollum and her family; (3) her current pregnancy; (4) her continued reliance on the assistance of her mother and father, the latter of whom is a registered sex offender for sexually abusing appellant's sister, which demonstrates that appellant may allow contact between her father and A.M., placing A.M. in danger; and (5) McCollum's failure to see a psychiatrist until August 3, 2016, despite having known his schizophrenia was a concern that had to be addressed since receiving the Texas ICPC home study. It specifically found that DHS had

made meaningful efforts to rehabilitate and correct the conditions that caused removal.[13] In finding that it was in A.M.'s best interest that appellant's rights be terminated, it found that A.M. was adoptable and cited the DHS supervisor's testimony for a demonstration of how A.M. would be at risk of potential harm if returned to appellant. This timely appeal followed.

## I. Standard of Review

We review termination–of–parental–rights cases de novo.[14] At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence.[15] Clear and convincing evidence is that degree of proof that will produce in the fact–finder a firm conviction as to the allegation sought to be established.[16] The appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous.[17] A finding is clearly erroneous when, although there is evidence to

---

[13]The circuit court had also found that DHS made reasonable efforts in its April 26, 2015, July 16, 2015, and November 4, 2015 review orders; January 15, 2016 permanency-planning order; and March 14, 2016 fifteen-months-review order.

[14]*Vail v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 150, 10, 486 S.W.3d 229, 234 (citing *Mitchell v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 715, 430 S.W.3d 851).

[15]*Id.* (citing Ark. Code Ann. § 9-27-341; *Dunn v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 34, 480 S.W.3d 186).

[16]*Id.* (citing *Anderson v. Douglas*, 310 Ark. 633, 839 S.W.2d 196 (1992)).

[17]*Id.* (citing *J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997)).

support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[18]

In making a "best interest" determination, the trial court is required to consider two factors: (1) the likelihood that the child will be adopted and (2) the potential of harm to the child if custody is returned to a parent.[19] Adoptability is not an essential element but is rather a factor that the trial court must consider.[20] Likewise, the potential harm to the child is a factor to be considered, but a specific potential harm does not have to be identified or proved by clear and convincing evidence.[21] The potential-harm analysis is to be conducted in broad terms.[22] It is the "best interest" finding that must be supported by clear and convincing evidence.[23]

The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home

---

[18]*Id.* (citing *Yarborough v. Ark. Dep't of Human Servs.*, 96 Ark. App. 247, 240 S.W.3d 626 (2006)).

[19]S*ingleton v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 455, at 4, 468 S.W.3d 809, 812 (citing Ark. Code Ann. § 9-27-341 (Supp. 2013)).

[20]*Id.*, 2015 Ark. App. 455, at 5, 468 S.W.3d at 812 (citing *Smith v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 430, at 4, 431 S.W.3d 364, 367).

[21]*Id.* (citing *Sarut v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 76, at 7, 455 S.W.3d 341, 346).

[22]*Id.*

[23]*Id.*

cannot be accomplished in a reasonable period of time as viewed from the child's perspective.[24] Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child.[25]

## II. Necessity of Texas ICPC Home Study

Appellant first argues that the circuit court erred in abdicating its duty to evaluate the evidence and make its own findings as to the issue of A.M.'s placement across state lines with appellant. Specifically, she argues that Arkansas holds that placement with a parent across state lines does not require an ICPC home study. Appellant never raised this argument below. We cannot review this assignment of error because it is incumbent upon the parties to raise arguments initially to the circuit court in order to give that court an opportunity to consider the issue.[26] Furthermore, she never objected to the circuit court's findings—found in numerous orders—that A.M. could not be returned to appellant's custody without an approved ICPC home study from Texas. It is well settled that the failure to raise a challenge or obtain a ruling below is fatal to the appellate court's consideration of an issue on appeal.[27]

---

[24]*Ford v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 226, at 3, 434 S.W.3d 378, 381 (citing Ark. Code Ann. § 9-27-341(a)(3) (Supp. 2013)).

[25]*Id.* (citing *Camarillo-Cox v. Ark. Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005); *Cole v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 203, 394 S.W.3d 318; *Tucker v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 430, 389 S.W.3d 1).

[26]*Blanchard v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 785, at 9, 379 S.W.3d 686, 691 (citing *Bell v. Misenheimer*, 2009 Ark. 222, 308 S.W.3d 120).

[27]*Anderson v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 522, at 8, 385 S.W.3d 367, 371 (citing *Bryant v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 390, 383 S.W.3d 901).

### III.  Termination

Appellant's second argument on appeal is that there was insufficient evidence to support a finding that termination was either in A.M.'s best interest or that the alleged grounds were proven or relevant to the circumstances of appellant and her boyfriend, Jeffrey McCollum. This court disagrees.

### A.  Best Interest

A best interest determination includes consideration of a child's adoptability and potential harm to the child if returned to the parent.[28] Appellant does not challenge the circuit court's adoptability finding and it is therefore affirmed. However, she argues that "a reversal is still proper on the potential-harm factor as it is a component of the 'best interest' finding and must be *proved* separate and apart from any statutory ground or adoptability." She argues in error. The circuit court is only required to *consider* the potential harm in returning a child to its parent.[29] The circuit court does not have to determine that every factor considered be established by clear and convincing evidence.[30] Instead, after

---

[28] *See Wilson v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 666, at 7, 476 S.W.3d 816, 821 (citing *Smith v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 753, at 4, 431 S.W.3d 364, 367).

[29] *See* Ark. Code Ann. § 9-27-341(b)(3)(A)(ii).

[30] *Welch v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 798, at 8, 378 S.W.3d 290, 295.

considering all of the factors, the evidence must be clear and convincing that the termination is in the best interest of the child.[31]

The DHS supervisor testified that DHS concurred with Texas's concerns with McCollum's untreated schizophrenia and stated that DHS had had an issue from the beginning of the case with appellant's financial deficiencies without the financial support of McCollum, her mother, and sex-offender father. Despite her admitted financial shortcomings, appellant testified that she was currently unemployed and pregnant, the latter of which will further stretch the funds McCollum receives and will likely require even more financial subsistence from appellant's mother and father. With these facts, in addition to the fact that A.M. had been in care at the time of the hearing for twenty-one of the twenty-four months of her life, considering all factors, this court cannot find that the circuit court erred.

## B. Grounds

### 1. Other Factors

Only one ground is necessary to terminate parental rights.[32] Although the trial court found several grounds, we base our decision to affirm on only one ground— other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that

---

[31]*Id.* (citing *McFarland v. Ark. Dep't of Human Servs.*, 91 Ark. App. 323, 210 S.W.3d 143 (2005); *see also Carroll v. Ark. Dep't of Human Servs.*, 85 Ark. App. 255, 148 S.W.3d 780 (2004)).

[32]*Friend v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 606, at 11, 344 S.W.3d 670, 676 (citing *Lee v. Ark. Dep't of Human Servs.*, 102 Ark. App. 337, 285 S.W.3d 277 (2008)).

appellant manifested the incapacity or indifference to remedy, despite the offer of appropriate family services.[33]

Despite appellant knowing of McCollum's schizophrenia issues from the beginning of their relationship, she did not tell DHS because it did not "bring up schizophrenia being an issue." DHS first learned of McCollum's untreated schizophrenia on February 12, 2016—when it received Texas's denial of placement of A.M. in appellant's home—more than fifteen months after A.M. was first taken into care. The circuit court's March 14, 2016 review order stated that "[t]he concerns raised by the State of Texas that caused the home study to be denied shall be addressed prior to placement" and that appellant "shall comply with the recommendations of the State of Texas as recommended in the ICPC home study." Despite knowing that McCollum's lack of treatment was a concern that needed to be addressed, McCollum did not receive care from a psychiatrist until August 3, 2016, twenty-three days prior to the TPR hearing and twenty-one months into the case.

Appellant's inability to keep a job, thereby requiring her reliance on McCollum, her mother, and her sex-offender father is also a subsequent issue that appellant has not remedied and apparently does not see a need to remedy based on her testimony that she did not "understand how [her] father's financial stability to help [her had] anything to do with the past." Appellant had been advised of her need to be financially self-sufficient at the beginning of the case and still had not acquired that position.

---

[33] *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a).

In deciding whether to terminate the parental rights of a party, the circuit court has a duty to look at the entire picture of how that parent has discharged his duties as a parent.[34] We are mindful that the stated purpose of the termination process is to provide permanency for the child when it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time.[35] A.M. has spent a substantial portion of her life in care while her mother and boyfriend delayed getting McCollum mental treatment and her mother failed to become financially self-sufficient. A child's need for permanency and stability may override a parent's request for more time to improve the parent's circumstances.[36] Even full compliance with the case plan—which is not present in this case—is not determinative; the only issue is whether the parent has become a stable, safe parent able to care for his or her child.[37]

This court cannot conclude that the circuit court erred in finding that DHS had proven the "other factors" ground raised in its petition.

Affirmed.

---

[34]*Friend*, 2009 Ark. App. 606, at 14, 344 S.W.3d at 677 (citing *In re Adoption of K.M.C.*, 62 Ark. App. 95, 969 S.W.2d 197 (1998)).

[35]*Jones v. Ark. Dep't of Human Servs.*, 361 Ark. 164, 187, 205 S.W.3d 778, 792 (2005) (citing Ark. Code Ann. § 9-27-341(a)(3)).

[36]*Shaffer v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 208, at 6, 489 S.W.3d 182, 185 (citing *Knuckles v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 463, 469 S.W.3d 377; *Loveday v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 282, 435 S.W.3d 504).

[37]*Id.*, 2016 Ark. App. 208, at 2, 489 S.W.3d at 184 (citing *Camarillo-Cox v. Ark. Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005); *Cole v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 203, 394 S.W.3d 318; *Tucker v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 430, 389 S.W.3d 1).



GLOVER and HIXSON, JJ., agree.

*Leah Lanford*, Arkansas Public Defender Commission, for appellant.

*Mary Goff*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.